Filed 10/28/21  P. v. Carroll CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C092527 |
| Plaintiff and Respondent, | (Super. Ct. No. 04F00144) |
| v. | |
| NICOLE CARROLL, | |
| Defendant and Appellant. | |

Defendant Nicole Carroll appeals the denial of her Penal Code section 1170.95 petition.[1]  She argues the trial court incorrectly analyzed her claim; she adds that substantial evidence does not support the court's finding that she could still be convicted of murder despite the change in the law at issue here.  In supplemental briefing, she argues for de novo review of her factual claim.

---

[1] Further undesignated statutory references are to the Penal Code.

Because we agree that the analysis was incorrect, we reverse the order denying the petition and remand for a new hearing. We need not and do not address the remaining claims.

## FACTUAL AND PROCEDURAL BACKGROUND

We quote at length from our unpublished opinion upholding defendant's conviction in her first appeal:

"***The shooting***

"On December 23, 2003, 19-year-old Matthew Seivert was living with his mother, Stepheny Milo, at her home in East Sacramento. Seivert and Carroll had been high school sweethearts, but they broke up when Carroll moved to Los Angeles in 2001. Around 8:00 p.m., Carroll called for Seivert, but he was not home. Seivert received a second call shortly before midnight, after which he asked his mother if he could borrow her Toyota Camry so he could 'see Nicole.' Although Milo initially refused, she finally relented and let her son borrow the car.

"Around 1:45 a.m., Sacramento City Police Officer Barry Lee went to Tahoe Park in response to a report of shots fired. Lee drove around the park, but saw nothing. At 2:20 a.m., Lee returned to a location on Eighth Avenue, very close to the park, and discovered the Camry, which had crashed up against a chain link fence. Seivert, unconscious and incoherent, was transported by ambulance from the Camry to the hospital.

"Seivert suffered two gunshot wounds, one to the left side of the head and another to the right chest. He also suffered lacerations and abrasions, consistent with having been struck by flying glass. Seivert died from his wounds.

"Three bullet jackets from a .38-caliber Charter Arms revolver were recovered from the Camry. There was possible bullet damage to the front driver's-side window, the rear driver's-side window and the rear window. A detective who inspected the Camry opined that gunshots had pierced each of the three windows.

2

## *"The Plot

"Six immunized witnesses--Quoc Lam,[2] Sieu Nguyen, Johnson Phan, Dac Su, Davis To and Damon Voong--testified about a meeting that took place at Voong's house on the evening of December 23, during which the plan was hatched to attack Seivert at Tahoe Park.  Sometimes their versions coincided; often their testimony conflicted not only with each other, but with the same witness's prior statements.  In accordance with settled principles [citations], we recite the evidence in the light most favorable to the judgments.

"John Lam, who was then dating Nicole Carroll, was angry with Seivert for making disparaging remarks about Asians in phone calls to Carroll . . . .  Lam devised a plan whereby Carroll would phone Seivert and ask him to meet her at Tahoe Park; Lam and his friends would drive to the park, wait for Seivert and then 'jump' him or beat him up.

"Lam called his cousin Quoc and told him about the plan to lure Seivert to the park and jump him.  Quoc went to his house and got his nunchakus.  He also had golf clubs in his trunk, which he thought could be used.  Lam called his cousin Davis To and told him he wanted to 'kick this white kid's ass' for making racial slurs.  Lam's friends and relatives contacted others, until 11 young men arrived at Voong's house, where they met with Carroll and Lam.  At the meeting were the five defendants--Carroll, Cooc, Dich, Lam and Ly--as well as the witnesses who testified under a grant of immunity.

"At Voong's house, Lam brought up the subject of beating up the 'white boy' to 'teach him a lesson' about using racial slurs.  Carroll said she wanted Seivert beaten up because she did not like him.  Lam explained that Seivert would meet Carroll at Tahoe Park, that the group should wait for him to get out of his car and then jump him.  Quoc

---

[2]  To avoid confusion with defendant John Lam, we hereinafter refer to John Lam as "Lam" and his cousin, Quoc Lam, as "Quoc."

intended to approach Seivert from behind, hit him a couple of times and smash his car with the nunchakus. Su intended to jump out of Quoc's car and beat Seivert up. There was some discussion at the house about Cooc and Ly having guns. However, killing or shooting Seivert was not explicitly discussed.

"During the meeting at Voong's house, Carroll called Seivert. Later, after speaking on her cell phone, she told the group that Seivert had called and they should go to Tahoe Park. Lam told everyone 'let's go' and instructed them to leave for the park. He told Quoc to meet him on the other side of the park and to block the Camry.

"The group traveled to Tahoe Park in three separate vehicles. The table below[] shows the vehicles that were driven and their respective drivers and occupants.

| Acura RSX | Honda Pilot | Honda Accord |
|---|---|---|
| **John Lam** (*driver*)* <br> **Nicole Carroll*** | **John Dich** (*driver*)* <br> **Jimmy Chi Cooc*** <br> **Hung Thieu Ly*** <br> Johnson Phan <br> Sieu Nguyen <br> Damon Voong <br> Tommy Vu | Quoc Lam (*driver*) <br> Dac Su <br> Davis To <br> Johnny Truong |
| *Defendants' names appear in boldface type. | | |

"As they drove to the park, Cooc and Dich had a conversation about a gun. Dich wanted to see Cooc's nine-millimeter gun, and it was passed around the Honda Pilot. Ly's .38-caliber revolver was also passed around. Ly tied a blue or black rag around his face that covered his nose and mouth.

"The three cars split up when they got to the park. They waited about 15 minutes for Seivert to arrive. Carroll alerted them by phone that Seivert was on his way.

4

"Seivert arrived at the park, got out of his Camry and approached Carroll, who was seated on a bench. The couple talked for a few minutes. Seivert reached for Carroll, but she pulled away. Seivert then returned to the Camry. Lam and Dich each said, 'Let's go get him,' or words to that effect. Because Seivert had backed into the parking space, someone in the Pilot said, 'Block him out.' Dich then drove the Pilot toward the driver's side of the Camry, parking at an angle. The Camry moved forward a little, but Lam's Acura RSX also pulled in front of the Camry, causing it to stop. The Camry was blocked in and had no room to leave. Quoc retrieved the nunchakus and Dac Su took out a golf club.

"Ly got out of the Pilot and pulled a gun from his waistband. Cooc also got out of the car with his gun drawn. Vu threw a Heineken bottle, which hit the Camry. Ly stood in front of the Camry and pointed his gun at the front windshield saying, 'Don't move' or 'stop, stop, stop.' Some witnesses thought Seivert revved the engine and the Camry may have moved forward a little.

"Ly fired at least three shots at the Camry. The first shot was fired at the front windshield, the second shot from the driver's side door, and the third from behind the Camry by the trunk. The group then returned to their vehicles and drove back to Voong's house. On the way back, Ly exclaimed, 'I got him in the head,' or 'I got him, I got him. He almost ran me over.' Ly also said, 'I did what I had to do,' and 'if he hadn't of moved I wouldn't have shot him. He almost ran me over.'

"Back at the house, Carroll smiled and said something to the effect of 'Oh, well, I didn't like him anyways.' About a week later, Lam called To and said he had spoken with a homicide detective and that he (To) should keep his story straight.

"On January 10, 2004 (all further calendar references are to that year), about three weeks after the shooting, police recovered a loaded nine-millimeter semiautomatic firearm from Cooc's residence. Two days later, police recovered the .38-caliber revolver used to kill Seivert from Dich's residence.

5

"Police recovered a box of .38-caliber live ammunition from Ly's home. The cartridges were loaded with soft-point, brass-jacketed Winchester .38 Special bullets-- similar in all respects to the bullets fired into the Camry. They also found two bandanas, one dark navy blue and the other black.

"Mobile phone records showed that defendants and the other participants placed numerous calls on their cell phones to one another throughout the late night and early morning hours of December 23 and 24, 2003. Carroll's cell phone records showed that she called Seivert's residence at 7:22 p.m. and 11:47 p.m. In addition, she called Seivert's cell phone at 12:39 a.m., 12:47 a.m. and 12:55 a.m. (minutes before the shooting), each time using '*67,' which is a means of blocking the calling number from display on the receiver's phone.

**"*Defense case***

"None of defendants testified. Defense counsel focused their defense on four central themes: (1) the prosecution witnesses who testified about the plot and shooting were unreliable and self-contradictory; (2) no one who participated in the plot to 'jump' Seivert said anything about shooting him; (3) Ly's decision to shoot Seivert was the unanticipated act of a maverick, and thus the crime of murder was not the natural and probable consequence of the agreement to beat up the victim; and (4) under the doctrine of imperfect self-defense, Ly's shooting of Seivert was not murder because Ly harbored a good faith but unreasonable belief that Seivert was trying to run him over with the Camry.

"The jury found Ly guilty of first degree murder with personal use of a firearm (§ 12022.53, subd. (d)); the jury also found true as a special circumstance that he intentionally killed the victim by lying in wait. Defendants Carroll, Cooc, Dich and Lam were found guilty of first degree murder, with a special finding that they were armed within the meaning of section 12022, subdivision (a)(1)." (*People v. Hung Thieu Ly*

6

(Sept. 23, 2008, C052280) [nonpub. opn.] [2008 Cal.App.Unpub. LEXIS 7965, at *2-9] (*Ly*).)

Defendant and her codefendants appealed with arguments including "erroneous jury instructions, error in admission and exclusion of evidence, prosecutorial misconduct, and the sufficiency of the evidence to support the verdict." (*Ly, supra*, C052280 at *1-2.) We found no prejudicial error and affirmed all judgments with the exception of a minor sentencing correction as to codefendant Ly only. (*Id*. at p. *2.)

*Defendant's Section 1170.95 Petition*

On January 15, 2019, defendant filed a petition for resentencing pursuant to section 1170.95, alleging she was prosecuted for and convicted of murder under the natural and probable consequences doctrine and could not now be convicted of murder following the passage of Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill No. 1437). The trial court denied defendant's request for appointment of private counsel, who continued her representation of defendant pro bono. The People opposed the petition on multiple grounds not relevant here and also sought its dismissal.

On January 27, 2020, the trial court issued an order to show cause (OSC), which directed the parties to brief certain issues including the applicable standard of proof; as relevant here, the People's briefing argued they did "not have to prove the guilt of the defendant again, but rather that [s]he could still be convicted of murder under the new definition based upon the record of conviction." Defendant's briefing argued in relevant part that the People had to establish every element of defendant's guilt under the revised statute beyond a reasonable doubt, and that her murder conviction should be vacated if the People failed to prove that she was still guilty of first degree murder.

The court held the OSC merits hearing on June 19, 2020. At that hearing, the People reiterated their belief that it was their burden to prove beyond a reasonable doubt "that [defendant] still could be convicted under a valid theory today." Defendant argued the People were required to prove every element necessary to sustain a conviction for

7

first degree murder beyond a reasonable doubt and that the evidence did not support such a showing.

On August 17, 2020, the trial court issued its order denying the petition. As relevant here, the court opined that: "[T]he People may have mainly been focused on the natural and probable consequences doctrine to get to murder, and then on lying in wait to get the murder to first degree murder, as theorized" in this court's prior opinion. "However, after the order to show cause hearing in this matter, this court now finds it beyond a reasonable doubt that a jury could still convict defendant Carroll on an aider and abettor theory of murder by means of lying in wait."

The trial court also observed that: "At the hearing, it became clear, beyond a reasonable doubt, that defendant Carroll was aware of the possibility that the victim would die in the assault. She was the instigator of the plan, she lured the victim to the scene of the crime, she concealed her purpose, the others were hidden initially and waited for opportunity and a position of advantage, then made their attack. The victim was ambushed, and she knew at the planning stage that one of the attackers would have nunchakus and that even guns were being considered to be brought. Defendant Carroll, at the order to show cause hearing, failed to present any evidence or show anything in the record that leads to a different conclusion."

The order continued: "Penal Code § 1170.95[, subd.] (a)(3) provides that a person convicted of felony murder or murder under the natural and probable consequences doctrine of accomplice liability is eligible for resentencing if the defendant could not be convicted of first- or second-degree murder because of changes to Penal Code [§§] 188 or 189 made effective January 1, 2019. Penal Code § 1170.95[, subd.] (d)(3) provides that the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the defendant is ineligible for resentencing. Read together, the plain language of these subsections are interpreted to mean that, absent the prosecution's showing of proof beyond a reasonable doubt that the defendant could be convicted of first- or second-

8

degree murder under Penal Code §§ 188 and 189 as they currently provide in light of SB 1437, the petitioner will be eligible for resentencing."

"After considering the record and the oral arguments of the parties and their briefings, this Court finds beyond a reasonable doubt that a jury could have convicted defendant Carroll of first or second degree murder under the SB 1437 changes to Penal Code §§ 188 and 189." The court denied the petition, and defendant timely appealed. The case was fully briefed on July 20, 2021.

On appeal, the Attorney General initially defended the trial court's denial of the petition, agreeing with defendant's position that "[t]he burden of proof at the section 1170.95, subdivision (d)(3) hearing is the key issue in this appeal" but arguing the trial court selected and applied the correct standard for the burden of proof. Defendant requested oral argument. After we scheduled argument in this case, the Attorney General filed a letter with this court withdrawing its reliance on an outlier case that misdescribes the burden of proof; defendant, in response, withdrew her request for oral argument. We removed the case from calendar and ordered it submitted.

## DISCUSSION

Defendant first contends the trial court erred in applying an incorrect analysis under section 1170.95, subdivision (d)(3) when evaluating her claim. The Attorney General concedes that *People v. Duke* (2020) 55 Cal.App.5th 113, review granted January 13, 2021, No. S265309, was not correctly decided and agrees with appellant's position "that superior courts should act as independent factfinders at evidentiary hearings held pursuant to Penal Code section 1170.95." (Citing *People v. Lopez* (2020) 56 Cal.App.5th 936 at pages 950-951, review granted Feb. 10, 2021, No. S265974.) We agree with the parties. Because we cannot conclude that the trial court determined the People proved beyond a reasonable doubt every element necessary to find defendant guilty of murder--as that offense is currently defined--we will reverse the order denying defendant's petition and remand for a new hearing on the OSC.

9

Senate Bill No. 1437, which took effect on January 1, 2019, limited accomplice liability under the felony-murder rule and eliminated the natural and probable consequences doctrine as it relates to murder, to ensure that a person's sentence is commensurate with his or her individual criminal culpability. (*People v. Gentile* (2020) 10 Cal.5th 830, 842-844.) Prior to the passage of Senate Bill No. 1437, under the natural and probable consequences doctrine, a defendant was "liable for murder if he or she aided and abetted the commission of a criminal act (a target offense), and a principal in the target offense, committed murder (a nontarget offense) that, even if unintended, was a natural and probable consequence of the target offense." (*People v. Lamoureux* (2019) 42 Cal.App.5th 241, 248; *People v. Munoz* (2019) 39 Cal.App.5th 738, 749 review granted Nov. 26, 2019, S258234.) Senate Bill No. 1437 amended section 188 to clarify that malice may not be imputed to a person based solely on his or her participation in a crime. (§ 188, subd. (a)(3).) Thus, pursuant to Senate Bill No. 1437, where the felony-murder rule is not at issue, a person must act with malice to be convicted of murder. (*Munoz*, at p. 749.)

Senate Bill No. 1437 also added section 1170.95, which created a procedure whereby persons convicted of murder under a felony-murder or natural and probable consequences theory may petition in the sentencing court to vacate their convictions and seek resentencing. As relevant here, defendant is eligible for relief under section 1170.95 if she could no longer be convicted of first or second degree murder due to changes to sections 188 and 189 made by Senate Bill No. 1437. (See § 1170.95, subd. (a)(3).)

Here, the trial court determined the prima facie showing was made and issued an OSC. The court then conducted a hearing to determine whether to vacate the murder conviction and resentence the petitioner on any remaining counts. (§ 1170.95, subds. (c), (d); *People v. Nguyen* (2020) 53 Cal.App.5th 1154, 1165-1166.) The parties agree that it was necessary for the prosecution to prove, beyond a reasonable doubt, that the petitioner

10

was ineligible for resentencing. (§ 1170.95, subd. (d)(3).) They now also agree on the showing actually required to comply with this requirement.

We agree with the parties that the prosecution must establish guilt beyond reasonable doubt under the new statutes; that is, the trial court must find beyond a reasonable doubt that defendant actually acted with the now-required mental state, as opposed to merely that a jury *could have* so found. (See *People v. Lopez, supra,* 56 Cal.App.5th 936, review granted, Feb. 10, 2021, S265974; *People v. Rodriguez* (2020) 58 Cal.App.5th 227, review granted, March 10, 2021, S266652; see also *People v. Fortman* (2021) 64 Cal.App.5th 217, 220-221, review granted July 21, 2021, S269228 [noting of all published cases to consider the issue, only *People v. Duke* has adopted the latter position].)

Here, both defendant and the Attorney General agree the trial court applied the standard articulated in *Duke*, rather than independently evaluating whether defendant *would* still be convicted of murder based upon a showing by the People beyond a reasonable doubt that every element currently required to establish her liability for murder had been met. This conclusion is consistent with the court's own wording of its order denying defendant's petition. As we have set forth *ante*, the court announced three separate times that defendant *could* still be convicted of murder.

Although the trial court did make the observation that: "At the hearing, it became clear, beyond a reasonable doubt, that defendant Carroll was aware of the possibility that the victim would die in the assault" and then recited certain facts supporting the observations, it is not clear the court itself found beyond a reasonable doubt all elements of the crime of conviction were proven beyond a reasonable doubt under the new law. Under these circumstances, we agree with the parties that we must remand the matter for a new section 1170.95, subdivision (d)(3) hearing. At the new hearing, the parties should be afforded the opportunity to present additional evidence, should they so request. In light of this open remand, we need not reach defendant's substantial evidence claim.

11

**DISPOSITION**

The order denying defendant's petition is reversed and the case is remanded for the trial court to conduct a new hearing under section 1170.95, subdivision (d)(3) as described by this opinion.

_____/s/_____

Duarte, J.

We concur:

_____/s/_____

Robie, Acting P. J.

_____/s/_____

Mauro, J.